UNITED STATES OF AMERICA

v.

Osama AWADALLAH, Defendant.

No. 01 CR. 1026(SAS).

United States District Court,
S.D. New York.

March 22, 2006.

Karl Metzner, Brendan R. McGuire, Assistant United States Attorneys, United States Attorney's Office, Southern District of New York, New York City, for the Government.

Jesse Berman, Elizabeth Fink, Sarah Kunstler, New York City, for Defendant.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

## I. INTRODUCTION

The selection of a jury for the trial of Osama Awadallah has resulted in an unprecedented problem. In May 2005, the parties selected twelve jurors and three alternates, but before they were sworn the Government took an interlocutory appeal of a pretrial evidentiary ruling. Close to eight months later, the appellate court affirmed the ruling and remanded for trial. The question presented here is whether the original jurors who are still available may be recalled to service or whether the Jury Selection and Service Act ("JSSA") requires a fresh start.

## II. BACKGROUND

### A. The Charges Against Osama Awadallah

Awadallah is a lawful permanent resident of the United States and a citizen of Jordan, who entered this country in April 1999 at the age of nineteen. In the Fall of 2001, Awadallah was living in San Diego, and beginning his second year at Gross-

mont College, studying English as a Second Language.[1]

On September 20, 2001, Awadallah was approached at his home by a group of FBI agents investigating the terrorist attacks of September 11, and was subsequently questioned for approximately six hours at an FBI office.[2] He was a subject of FBI investigation because a scrap of paper with the words "Osama 589–5316" had been found inside a car abandoned by Nawaf Al–Hazmi, one of the hijackers of American Airlines Flight 77.[3] Agents had matched this number to a phone at a residence where Awadallah had briefly lived nearly two years earlier.[4] On the morning of September 21, 2001, Awadallah was again brought to the FBI office, where he was given a polygraph test, questioned, and eventually arrested as a material witness.[5] Over the following weeks, between September 21 and October 10, Awadallah was held in solitary confinement, and treated as a high security federal prisoner.[6]

On October 10, Awadallah was brought before a grand jury as a material witness. During the course of his grand jury testimony, the prosecutors repeatedly asked Awadallah about his knowledge of Al–Hazmi.[7] Awadallah answered that he had met Al–Hazmi while working at a gas station in San Diego in the Spring of 2000, and had last seen him in December 2000, and described a number of innocuous encounters with Al–Hazmi. The prosecutors also asked Awadallah about Khalid Al–Midhar, another of the hijackers whom Awadallah had seen in Al–Hazmi's company. Awadallah described Al–Midhar's appearance, but said that he did not know the man's name. The Government then showed Awadallah a photocopy of his college exam booklet, in which Al–Midhar's name was written. Awadallah claimed that the handwriting was not his.

Awadallah appeared before the grand jury a second time on October 15.[8] At that time, he testified that he was able to recall that the man with Al–Hazmi had been introduced to him as "Khalid." Awadallah claimed that he did not remember that he knew that name until after his October 10 testimony. Awadallah also testified that the handwriting in his exam booklet was his. He claimed that he had been confused on October 10, and had not recognized the handwriting as his.

**B. Procedural History**

Awadallah is charged with two counts of perjury arising from his grand jury testi-

---

**1.** See United States v. Awadallah, 202 F.Supp.2d 17, 21–22 (S.D.N.Y.2002) ("Awadallah II").

**2.** See United States v. Awadallah, 202 F.Supp.2d 82, 88–92 (S.D.N.Y.2002) ("Awadallah IV").

**3.** See id. at 86.

**4.** See id.

**5.** See id. at 93–97. The material witness statute, 18 U.S.C. § 3144, provides that "If it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person...."

**6.** See United States v. Awadallah, 202 F.Supp.2d 55, 59–60 (S.D.N.Y.2002) ("Awadallah III") (reading the allegations regarding Awadallah's confinement in the light most favorable to the Government, and declining to make findings of fact on disputed issues).

**7.** Awadallah's October 10 grand jury testimony is described in detail in Awadallah II, at 25–34.

**8.** The October 15 grand jury testimony is described in Awadallah II, at 35–36.

mony: (1) his denial that he knew Al-Midhar's name, and (2) his denial that the handwriting in his exam booklet was his.[9] He was indicted on October 31, 2001 and released on bail in early December.[10] That same month, Awadallah moved to dismiss the indictment and to suppress the statements and search evidence obtained by the FBI on September 20 and 21.[11] The Government appealed this Court's order to dismiss the indictment on May 2, 2002, and the Second Circuit reversed the dismissal on November 7, 2003.[12] The Supreme Court denied a petition for writ of certiorari on January 10, 2005.[13]

On May 23, 2005, the parties selected a panel of twelve jurors and three alternate jurors for Awadallah's trial. During a pretrial conference held on May 24, this Court made a preliminary ruling as to the admissibility of the proposed testimony of grand jurors.[14] The ruling was published as an opinion on May 31,[15] and the Government immediately filed an appeal. The jury had not yet been sworn, and the parties agreed that because the length of the delay was unknown, the jury would be "kept on hold." [16] On May 31, 2005, I informed the jury that "unforeseen events and circumstances prevent us from going forward with this case at this time." [17] I gave the panel members the following instruction:

> So what happens next is that your jury service is over without this trial proceeding at this time. When we can proceed, we will call all of you. And if you are able to serve, in other words, if you're not out of town or in some other way unavailable, if you're able to come back and serve, we will keep this jury. But we can't ask you to put your lives on hold. So you can go back to your work, go back to your plans, go back to your summer vacations, because we can't tell you the exact date. But when that date comes, and it could be days, could be more, we will call you. And if you're available, you are the jury in this case and that's what we'll do.[18]

The Second Circuit held oral argument on the government's appeal on December 12, 2005 and issued an opinion affirming this Court's evidentiary ruling on January 26, 2006.[19] On February 10, on the consent of both parties, I mailed a letter to each of the fifteen panel members stating the following:

> In May of 2005 you were selected to serve as a trial juror on the *United States v. Awadallah* case in the United States District Court for the Southern District of New York. I informed you then that the trial would not go forward at that time, but that you might be called back to serve at a later date. This letter is to inform you that the trial is now scheduled to begin on April 17, 2006, and is estimated to last two weeks.

9. *See United States v. Awadallah*, 173 F.Supp.2d 186, 187–88 (S.D.N.Y.2001) (*"Awadallah I"*).

10. *See id.* at 192–93.

11. *See Awadallah III; Awadallah IV*.

12. *See United States v. Awadallah*, 349 F.3d 42 (2d Cir.2003).

13. *See Awadallah v. United States*, 543 U.S. 1056, 125 S.Ct. 861, 160 L.Ed.2d 781 (2005).

14. *See United States v. Awadallah*, 401 F.Supp.2d 308, 310 (S.D.N.Y.2005) (*"Awadallah V"*).

15. *See id.*

16. 5/31/05 Transcript ("Tr.") at 8.

17. *Id.* at 11.

18. *Id.* at 11–12.

19. *See United States v. Awadallah*, 436 F.3d 125 (2d Cir.2006).

Please fill out and return the bottom portion of this letter to the Court in the enclosed envelope no later than February 22, 2006. We will contact you again if your services are required. Your response to this letter will be maintained confidentially by the Court and will not be made available to the parties or their lawyers.[20]

The jurors were asked to indicate whether they would be available, and if not, to provide an explanation for their unavailability.[21] Eight jurors informed the Court that they would be available, six provided reasons why they could not serve, and one did not respond.

Awadallah argues that the members of the panel who are available should be called to serve as trial jurors in this case. The Government submits that calling the available jurors would violate the JSSA.[22]

## III. LEGAL STANDARD

The JSSA provides that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."[23] The Act provides that a litigant "may move to dismiss the indictment or stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury."[24]

■■■ To prevail under the JSSA, a party must submit evidence that demonstrates "a *substantial* failure to comply" with the Act.[25] "Mere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions."[26] Thus, the Eleventh Circuit Court of Appeals has explained that "the alleged violations must be weighed against the underlying principles of the Act. A substantial violation of the Act will be found *only* when two important general principles are frustrated: (1) random selection of juror names *and* (2) use of objective criteria for determination of disqualifications, excuses, exemptions, and

20. 2/10/06 Letter from the Court to *United States v. Awadallah* Jurors at 1.

21. *See id.*

22. 28 U.S.C. §§ 1861–1871.

23. *Id.* § 1861. The JSSA dictates that each district create a plan to comply with the Act. *See id.* § 1863. The plan for the Southern District of New York establishes that the clerk must "publicly draw at random" the cards of "as many persons as appear to be needed" and then "randomly assign jurors to jury panels." Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York (Apr. 11, 2002), http://www.nysd.uscourts.gov/juryplanapr02.pdf ("S.D.N.Y. Jury Selection Plan"), art. IV(C).

24. 28 U.S.C. § 1867(b).

25. *Id.* § 1867(d) (emphasis added). The Government argues that it should not be required to show a "substantial" violation at the outset of the trial, because this standard has generally been used when attempting to overturn an indictment or conviction after the fact. However, the provision of the JSSA that requires a "substantial failure to comply" is explicitly identified as "the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." *Id.* § 1867(e). Thus, because the Government is relying on the JSSA, it must show a substantial failure to comply with its provisions.

26. *United States v. Miller*, 116 F.3d 641, 657 (2d Cir.1997) (quotation omitted). *Accord United States v. Bearden*, 659 F.2d 590, 601 (5th Cir.1981) ("Mere technical deviations from the Act or even a number of them are insufficient"—a substantial violation of the JSSA will be found only when its "principles are frustrated.") (quotation omitted).

exclusions." [27] A substantial violation is also more likely to be found where there is a risk of discrimination—the Eighth Circuit Court of Appeals has held that "the essence of randomness is the absence of any arbitrary attempt to exclude a class of persons from the jury." [28] Similarly, the JSSA's legislative history counsels that "[i]t is sufficient for the purpose of this legislation if the [district's] plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups." [29]

Courts have generally expressed "no doubt that the use of volunteer jurors offends the random selection requirement of the [JSSA]." [30] When a juror has volunteered, "a substantial variable, not contem-

plated by the Act's few, narrow categories of qualifications, exemptions, and excuses, has confounded the selection process." [31] However, as the Seventh Circuit, sitting en banc, has explained, "[s]ome voluntarism is ... implicit in the use of voter lists, since there is no legal duty in this country to vote." [32] Thus, that Court held that the JSSA did not "establish a requirement of randomness so rigorous as to forbid any trace of voluntarism." [33]

## IV. DISCUSSION

■ If all fifteen of the jurors chosen in May 2005 had been available to serve in April 2006, both parties agree that the panel would have constituted a fair and impartial jury.[34] The question, however, is

**27.** *United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984) (emphasis added). *Accord United States v. Nelson,* 718 F.2d 315, 318 (9th Cir.1983) ("There was no offense against the Act's twin goals of fair sampling and objectivity.").

**28.** *McClendon v. United States,* 587 F.2d 384, 387 (8th Cir.1978).

**29.** S.Rep. No. 891, 90th Cong., 1st Sess., at 16 n. 9 (1967). *Accord Bearden,* 659 F.2d at 602 ("The legislative history makes clear that Congress did not intend for 'random selection' under the Act to be defined as 'statistical randomness'... While the methods used here by the jury clerk were 'statistically nonrandom,' there is no showing they *either allowed discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross sections of the community."*) (emphasis added).

**30.** *United States v. Ramirez,* 884 F.2d 1524, 1530 (1st Cir.1989). *Accord United States v. Branscome,* 682 F.2d 484, 485 (4th Cir.1982); *United States v. Kennedy,* 548 F.2d 608, 610–12 (5th Cir.1977). *See also United States v. Resto,* 824 F.2d 210, 214 (2d Cir.1987) ("[t]he cases cited by [defendant] ... are inapposite as they both involved jurors who volunteered for service—thus destroying randomness").

**31.** *Kennedy,* 548 F.2d at 612.

**32.** *United States v. Gometz,* 730 F.2d 475, 482 (7th Cir.1984) (en banc). "Congress not only recognized, but desired, that venires drawn from lists of registered voters would not be random: 'Voter lists contain an important built-in screening element in that they eliminate those individuals who are either unqualified to vote or insufficiently interested in the world about them to do so.' " *Id.* at 479 (citation omitted) (quoting S.Rep. No. 891, at 22).

**33.** *Id.* at 482.

**34.** *See, e.g.,* Tr. at 7–8 ("There was a fair and appropriate jury selection and the Government is perfectly content with this jury, which is why, as I said a minute ago, we would not object to this jury being kept on hold.") (statement of Robin Baker, Assistant United States Attorney). Awadallah argues that the Government consented to recalling any available members of the existing panel. *See* 3/13/06 Letter from Sarah Kunstler, Counsel to Awadallah, to the Court ("3/13/06 Letter") at 2. But the Government's consent was solely to keep the jurors on hold until the rescheduled trial. *See* Tr. at 4 ("Under those circumstances, the Government does not object."). The Government did not indicate its position if all fifteen were not available to sit when the trial was rescheduled.

whether the unavailability of some of these jurors makes the remaining jurors volunteers, in violation of the JSSA. Awadallah argues that keeping those jurors who were fairly and randomly selected does not violate the Act. To the contrary, Awadallah argues, allowing the Government to essentially strike these jurors rewards the Government for taking an appeal on which it failed to prevail.

The Government has cited several decisions by federal appellate courts in which jurors were held to be volunteers. For example, in *United States v. Kennedy,* the clerk contacted former jurors by telephone and "made clear that such [additional] service was not mandatory, that she was simply seeking volunteers." [35] Similarly, in *United States v. Ramirez,* a clerk called potential jurors to see if they would serve, but "[n]one of those called were told that they had to serve as a juror." [36] The Court in *United States v. Branscome* held that it was impermissible to "ask[ ] for volunteers to serve on the grand jury from the pool of prospective jurors who had been randomly selected." [37]

In *United States v. Gometz,* the Seventh Circuit clarified the distinction between a "volunteer" jury and a jury that resulted from a permissive standard of excusing jurors based on hardships. The Court acknowledged that "[t]here [wa]s a sense in which those who return completed juror qualification forms to the clerk of the Southern District of Illinois [we]re 'volunteers,' since there [wa]s no follow-up of those who fail to respond." [38] But it was "apparent from the legislative history that the words 'selected at random' were not intended literally and that self-screening was not anathematized." [39] Therefore, the Court held that it was not an abuse of discretion to decide that a thirty percent return rate for jurors called to service was "good enough in the circumstances." [40]

Even where a court does find that jurors volunteered for service, it may nevertheless hold that there was no "substantial violation" of the JSSA. For example, the *Ramirez* court did not provide a remedy under the JSSA despite finding that volunteer jurors had been used because the test "for a substantial violation is whether it 'either allowed discriminatory selection of jurors or otherwise prevented jury panels from consisting of fair cross sections of the community.'" [41]

The jurors chosen in May 2005 cannot be considered volunteers. At that time, I explained to the jurors that "when that date comes, and it could be days, could be more, we will call you. And if you're available, you are the jury in this case and that's what we'll do." [42] No one indicated that the jurors' obligations to serve had ended.[43] The passage of time did not

---

**35.** 548 F.2d at 610.

**36.** 884 F.2d at 1527.

**37.** 682 F.2d at 485.

**38.** 730 F.2d at 481.

**39.** *Id.* at 479.

**40.** *Id.* at 482.

**41.** 884 F.2d at 1530 (quoting *Bearden,* 659 F.2d at 602).

**42.** Tr. at 11–12.

**43.** The Government emphasizes the statement "what happens next is that your jury service is over," but that statement was followed with the caveat *"without this trial proceeding at this time."* I immediately followed this by saying: "When we can proceed, we will call all of you. And if you are able to serve, in other words, if you're not out of town or in some other way unavailable, if you're able to come back and serve, we will keep this jury." *Id.* (emphasis added). The overall message to the jurors was that their service would continue when the trial resumed, barring undue hardship.

change the fact that the jury was "selected at random from a fair cross section of the community" under the JSSA.[44] Moreover, the Government has never argued that there is any risk of "impermissible discrimination against individuals or groups."[45] Indeed, there is no such risk. Finally, the fact that certain members of the jury are now unavailable to serve is also irrelevant.[46] The jurors chosen in May 2005 will only be excused from service as any juror would be excused "upon a showing of undue hardship or extreme inconvenience."[47]

In sum, the Government has not shown that the available jurors should be considered "volunteers," and has not otherwise demonstrated a substantial violation of the JSSA. Thus, I find that the Government is not entitled to relief under that Act.

## V.  REMEDY

Awadallah argues that the Government's decision to take an interlocutory appeal during the prosecution of a crime should not in any way prejudice a defendant. Indeed, the Supreme Court has acknowledged in a different context that the "interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one."[48] Awadallah urges the Court to recall the available jurors directly to the jury and "continue jury selection to fill the remaining seats."[49]

However, the Government has a countervailing interest in the opportunity to choose a complete jury at once, using its peremptory strikes strategically to obtain a desired whole. "[T]rial courts retain a broad discretion to determine the way peremptory challenges will be exercised,"[50] and I find that as a matter of fundamental fairness, the Government should have this opportunity.

Therefore, the jurors selected in May 2005 shall be notified that their jury service is still required. Those jurors whose written excuses to the Court rise to the level of undue hardship will be excused. All of the remaining jurors shall be subjected to a renewed voir dire examination. Any juror not excused for cause will be

---

**44.**  28 U.S.C. § 1861. Indeed, the parties conceded this by expressing a willingness to call the same jury if all of them were available to serve. *See* Tr. at 7–8.

**45.**  S.Rep. No. 891, at 16 n. 9.

**46.**  Awadallah provides a useful hypothetical to illustrate this point: "Imagine a scenario where twelve jurors and three alternates were selected on a Friday for a trial beginning on the following Monday. By the Monday of trial, only eight of the fifteen selected are able to serve due to circumstances unforeseen the Friday before. In this situation, would the remaining eight have been transformed, in the Government's words, into 'inappropriate volunteers who otherwise have no obligation to return'?" 3/13/06 Letter at 3–4 (quoting 3/10/06 Letter from Karl Metzner, Assistant United States Attorney, to the Court at 1).

**47.**  S.D.N.Y. Jury Selection Plan, art. VIII. *Accord* 28 U.S.C. § 1866(c).

**48.**  *Illinois v. Somerville,* 410 U.S. 458, 471, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973) (citing *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971)). The *Somerville* opinion considers this issue in the context of the double jeopardy clause. In the instant case, however, double jeopardy has not attached because the jury was not sworn. The Government notes that when a jury has not been sworn, defendants do not have a constitutional right to " 'a jury of any particular composition.' " 3/15/06 Letter from Karl Metzner to the Court at 1 (quoting *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)).

**49.**  3/13/06 Letter at 4.

**50.**  *United States v. Blouin,* 666 F.2d 796, 797 (2d Cir.1981).

seated as part of the panel of thirty-five people from which the jury and alternates shall be chosen. Additional voir dire will be conducted to complete this panel. Awadallah and the Government will then be entitled to use their peremptory strikes in the usual manner.[51]

SO ORDERED.

---

**51.** At a pretrial conference held on March 20, the Court proposed this remedy to the parties and offered them a chance to object. The Government has objected only by asserting that the jurors chosen in May 2005 should not be recalled at all. Awadallah has not objected to this procedure.