**UNITED STATES of America,**

v.

**Osama AWADALLAH, Defendant.**

**No. 01 Cr. 1026(SAS).**

United States District Court, S.D. New York.

April 30, 2002.

---

**32.** *See supra* note 24 (citing material witness statutes from 1789, 1846, and 1928).

Robin Baker, Karl Metzner, Celeste Koeleveld, Rosemary Nidiry, Assistant United States Attorneys, United States Attorney's Office, Southern District of New York, New York City, for U.S.

Jesse Berman, New York City, for Defendant.

## SECOND OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. INTRODUCTION

In a companion Opinion issued today, this Court held that the federal material witness statute, 18 U.S.C. § 3144 ("section 3144"), does not authorize the detention of material witnesses for a grand jury investigation. *See United States v. Awadallah* ("*Awadallah III*"), 202 F.Supp.2d 55, —— (S.D.N.Y.2002). Because Awadallah was unlawfully detained under that statute, this Court suppressed his grand jury testimony as the product of an unlawful seizure and dismissed the perjury charges stemming from that testimony. *See id.* at ——.

This Opinion, filed simultaneously, decides the remaining motions in this case. Although the first opinion is dispositive, these motions are nonetheless decided at this time for two reasons. *First,* from February 15–18, 2002, this Court held a four-day hearing, and the facts related to that hearing should be decided while the witnesses' testimony is still fresh. *Second,* if a higher court interprets the material witness statute differently and holds that Awadallah's indictment was improperly dismissed, the remaining motions will necessarily have to be decided before proceeding to trial. Neither judicial efficiency nor the defendant's interest in a prompt adjudication of the charges would be served by deciding these motions at a later date with possible piecemeal appellate review over the course of months, if not years.

For the reasons explained below, I conclude that the indictment must be dismissed because of material omissions and misrepresentations in the application for the arrest warrant. I also grant Awadallah's motion to suppress all evidence and statements obtained on September 20–21, 2001.

### II. FINDINGS OF FACT

The prosecution and the defendant agree as to the general events of the two days before Awadallah was formally arrested. In the afternoon of September 20th, a group of FBI agents obtained Awadallah's consent to search his home and cars, which he partially revoked later that day. That same day, two agents interviewed Awadallah for approximately six hours at the FBI's San Diego office. The next day, September 21st, Awadallah took a lie detector test during which the examiner asked Awadallah if he had personal knowledge about the September 11th attacks. Awadallah denied ever having such knowledge. The polygraph examiner accused him of lying and the agents challenged Awadallah to confess, but Awadallah maintained that he was telling the truth. The agents discussed these facts with an Assistant U.S. Attorney from the Southern District of New York who instructed the agents to arrest Awadallah as a material witness in the grand jury's investigation of the September 11th attacks. Several hours later, the government obtained a warrant for Awadallah's arrest as a material witness.

Here, the devil is in the details. Awadallah claims that the agents did not ask him if he would agree to be interviewed—rather, the agents told him he must come to their office and that he could not drive on his own—they would drive him. He further claims that he did not voluntarily

agree to the interview, freely sign the consent forms or agree to take the polygraph exam of his own volition. According to Awadallah, the agents threatened and coerced him into doing so. The government sharply contests these accusations. In addition, the parties disagree about the timing of various events that occurred over those two days. Because the parties dispute the specifics of the events of September 20–21, it is necessary to make the following findings of fact.

### A. September 20, 2001

At nine o'clock on the morning of Thursday, September 20, 2001, FBI agents and other law enforcement personnel met at the FBI's field office in San Diego. *See* Tr. at 6–7, 168–69.[1] These agents were members of a team that had been formed to assist in the investigations of the September 11th attacks. The group was led by FBI Special Agent Alberto Cortes and included, among others, the following Special Agents from the FBI: Aurelia Alston, David Anthony, Andrew Bedell, David Crawford, William Dayhoff, Anthony Davis, Bradlee Godshall, Steven Kozma, Greg McNutt, Brian Rielly, and Frank Teixeira. In addition, Richard Latulip, a

Special Agent with the Secret Service, and Teofilo Weston, a Detective with the San Diego police, were assigned to the team.[2]

That morning, eight agents were dispatched to Awadallah's home in order to interview him and his roommates. *See id.* at 7, 37. The agents were also instructed to obtain consent from Awadallah and his roommates to search their property.[3] *See id.* at 7, 37, 109. Awadallah was a subject of the investigation because agents had found a scrap of paper with the words "Osama 589–5316" inside a car abandoned by Nawaf Al–Hazmi, one of the hijackers of American Airlines Flight 77, at Washington Dulles International Airport on the afternoon of September 11th. *See id.* at 111–12, 247, 698–99. The FBI had subsequently matched this number to a phone at a residence where Awadallah had briefly lived nearly two years earlier. *See id.* at 946.

Based on this connection to Al–Hazmi, the FBI began an investigation of Awadallah. For example, "several days prior" to September 20th, Agent Teixeira interviewed an individual who told him where Awadallah "had previously worked," that Awadallah had been fired from one of those jobs, and informed him that Awadal-

---

1. "Tr." refers to the transcript of the hearing held on February 15 to 18, 2002. "GX" refers to a Government exhibit at the hearing; "[date] Tr." refers to the transcript of court or grand jury proceedings on the indicated date. "GJX" refers to a grand jury exhibit. "Berman Aff." refers to the Affirmation of Jesse Berman, Esq., dated December 3, 2001. "Awadallah Aff." refers to the Affidavit of Osama Awadallah, dated December 26, 2001. "Gov't Mem." refers to the "Government's Post Hearing Memorandum in Opoosition to Defendant's Motions to Dismiss the Indictment and to Suppress the Evidence." "Reply Mem." refers to the Government's Post–Hearing Reply Memorandum. "Plunkett Aff." refers to the affidavit submitted by Special Agent William Ryan Plunkett on September 21, 2001.

2. "There was [also] a gentleman from the California Department of Justice," Tr. at 29 (Agent Alston testifying), "[o]ne FBI support employee—a computer specialist," *id.* at 226 (Agent Bedell testifying) and "another individual there and ... she was with a local law enforcement agency that also worked in computers," *id.*, who participated in the investigation on September 20th (*i.e.*, the search of Awadallah's apartment and cars).

3. Some of the agents knew about the assignment prior to September 20th. *See, e.g.*, Tr. at 168 (Agent Kozma testifying: "The night prior to the 20th I was informed to come into the San Diego field office at which time we would transport over to the Saranac address.").

lah knew "one of the suspected hijackers from September 11th." *Id.* at 244. On September 19th, Agents Rielly and Crawford went to Awadallah's apartment complex at 7200 Saranac Avenue in order to determine who lived in the complex and to record license plate numbers of cars in the parking lot. *See id.* at 72. Later that day, an agent at the FBI field office ran the license plate numbers through the motor vehicles records database and determined which cars in the parking lot were owned by Awadallah.[4] *See id.* at 104; *see also* GX 3507–A (9/19/01 FBI 302 Report). Agents Rielly and Crawford also interviewed at least one of Awadallah's neighbors that day. *See* Tr. at 104–08. By September 20th, the FBI knew which apartment Awadallah lived in, which cars he owned, the people who lived with him, his neighbors, the various parking spots and cars associated with the apartment, Awadallah's legal status in the country, and the fact that he and his roommates were students at Grossmont College.

At 9:30 a.m., a lead squad of eight agents left the FBI office and re-assembled in a parking lot near Awadallah's apartment complex. *See id.* at 67, 170. At the same time, Agents Dayhoff and Davis were assigned to go to Grossmont College to interview one of Awadallah's roommates.[5] *See id.* at 200. Agent Rielly and Detective Weston were assigned to interview one of Awadallah's neighbors and her husband at their respective workplaces.[6] *See id.* at 73–74. The agents were dressed

in business attire and, while all of the agents were armed, they concealed their weapons beneath their clothes. *See id.* at 49, 81.

After meeting in a nearby parking lot for about twenty minutes, the agents drove to the apartment complex. *See id.* at 170. They arrived at approximately 10:15 a.m. *See id.* at 9; *see also* GX 3509–D. Once at the apartment complex, two agents were posted at the bottom of the stairs "to provide crowd control" and "to keep other people from coming up the stairs who weren't involved." Tr. at 170. Agent Kozma and the other agents then knocked on the door of Awadallah's second floor apartment. *See id.* at 170–71. When no one answered, the agents walked back down the stairs and waited in the parking lot. *See id.* at 171.

Around 11:30 a.m. Awadallah's roommate, Yazeed Al–Salmi, drove into the parking lot. *See id.* at 9, 42–43, 53. The agents recognized Al–Salmi when he drove into the complex. As Al–Salmi got out of the car, Agent Alston and another agent approached him. *See id.* at 9, 18, 43–44. The agents identified themselves, showed their FBI credentials and asked for Al–Salmi's identification, which he provided. *See id.* at 45–47. The agents asked Al–Salmi to answer some questions. *See id.* at 46. The agents then accompanied Al–Salmi into the apartment where they ques-

---

4. The report prepared by Agents Rielly and Crawford lists seven "California License Plates [that] were obtained from vehicles that were not parked in numbered parking spaces." GX 3507–A. Two of those numbers belonged to Awadallah's gray and white Hondas.

5. Agent Dayhoff did not specify in his testimony whom he interviewed at Grossmont College. *See* Tr. at 200. In addition, while at the college, Agents Davis and Dayhoff "got

switched to another, found him, interviewed him, and he gave us information on the first individual we were interested in . . . ." *Id.* at 200–01.

6. Agent Bedell "[t]hought Awadallah went to Grossmont [College]" and was "looking for [Awadallah's] vehicle at [the] college" when he "[h]eard on [the] radio that [Awadallah] had arrived at [his] apartment." GX 3510–E.

tioned him for the next two to three hours.[7] *See id.* at 10–11, 18–22, 53.

While the agents were interviewing Al–Salmi, Awadallah was attending his "English as a Second Language" class at Grossmont College.[8] *See id.* at 896, 899. After the class ended at 1:30 p.m., Awadallah drove home to "[t]ake a rest and pray," *id.* at 899, and arrived at the apartment complex around 2:00 p.m. *See id.* at 75 (Agent Rielly testifying that "it was approximately 2:00, maybe 2:30, [when] Mr. Awadallah arrived."). *See also id.* at 139–40. When Awadallah drove into the parking lot he noticed three men standing together as well as a number of cars that were not parked in any particular parking space. *See id.* at 903.[9] The agents recognized Awadallah and his gray Honda as he drove into the parking lot. *See id.* at 75. Agent Rielly and Detective Weston (who had been instructed to go to the apartment complex when they were at Grossmont College) and another agent approached the gray Honda. At least two FBI agents were also nearby, *see id.* at 83, 155, 179–80, 904, 1034, and about two or three others were elsewhere in the parking lot. *See id.* at 83, 120, 179–80.

Detective Weston introduced himself to Awadallah and said that he wanted to ask him some questions. *See id.* at 79, 904. After Detective Weston asked questions for a few minutes,[10] Agent Rielly identified himself and asked Awadallah to produce identification. *See id.* at 904. Awadallah showed the agents his California driver's license, and Agent Rielly copied down the information. *See id.* at 80, 114, 128–29, 904–05. Agent Rielly explained to Awadallah that he needed to speak with him for about thirty minutes at the FBI's office, *see id.* at 906, and Awadallah could follow the agents to the FBI building in his own car. *See id.* at 89, 141–42, 906. Awadallah agreed to talk with Agent Rielly but asked why he could not be interviewed in the apartment. *See id.* at 907. Agent Rielly went over to another agent and talked with him for a few minutes. *See id.* Agent Rielly returned and instructed Awadallah to leave his car at the apartment and informed him that the agents would drive him to the FBI office.[11] *See id.*

---

**7.** Agent Alston testified that Al–Salmi "told us he would be happy to answer questions, and we went up to his apartment," but the record is unclear as to who suggested entering the apartment. Tr. at 10. Agent Alston also testified that when she first presented a "consent-to-search form" in the apartment, Al–Salmi's first reaction was to say "I don't really have any choice," which indicates that Al–Salmi perceived the situation to be coercive. *Id.* at 11. Regardless, the issue of whether Al–Salmi in fact consented to be interviewed or to allow the agents to search his property was beyond the scope of the hearing on February 15–18, 2002.

**8.** Awadallah had also attended math class from 9:00–11:00 a.m. *See* Tr. at 898.

**9.** The findings of fact until this point are based on the testimony of witnesses other than Awadallah. From this point forward, when in conflict with the testimony of others, I credit Awadallah's testimony with two exceptions. *First,* I do not credit Awadallah's estimate that fifteen to twenty agents approached him in the parking lot. *Second,* I do not credit his testimony as to when he was left alone in the interrogation room on September 21, 2001. *See infra* note 19. I make no findings of fact with respect to the events during his twenty days of detention prior to testifying before the grand jury. Where findings of fact are cited to testimony *other than* that of Awadallah, I credit that testimony.

**10.** For example, Detective Weston asked Awadallah his name, where he was from, whether he went to school, how old he was, and if he had family in the United States. *See* Tr. at 904.

**11.** The agents testified that they did not want Awadallah to drive his own car for safety reasons. *See* Tr. at 90 (Agent Rielly testifying: "[I]f he chose that he—on the way down to the field office, if he decided that he didn't

At this point, Awadallah insisted that the agents allow him to go up to his apartment. *See id.* at 907–08. Awadallah made this demand because, as a devout Muslim, he prays five times a day including once at midday (*i.e.,* generally around 1:00 p.m.). *See id.* at 886–87. Before each prayer, Awadallah washes his mouth, nose, face, head, hands, and feet. *See id.* at 908. Agent Rielly initially suggested that he could pray at the office but, after Awadallah continued to insist, Agent Rielly talked with some other agents and permitted him to enter his apartment. *See id.* at 909–10. Agent Rielly and Detective Weston then escorted Awadallah to the second floor. *See id.* Prior to entering the apartment, however, Agent Rielly told Awadallah to wait while he went inside. *See id.* at 910. After a few minutes, Agent Rielly came back outside and told Awadallah he could enter. *See id.* at 910–11.

When Awadallah entered his apartment, he realized for the first time that his roommate Al–Salmi was being interviewed.[12] *See id.* at 911–12. There were four agents already inside the apartment. *See id.* Awadallah went to the bathroom in order to urinate and prepare to pray. *See id.* at 912–13. Before Awadallah entered, Agent

Rielly patted him down to make sure he was not carrying any weapons or sharp objects. *See id.* at 91, 141, 912. As Awadallah began to close the bathroom door behind him, Detective Weston put his foot between the door and the wall and ordered him to leave it open. *See id.* at 913. Awadallah "wasn't very happy with that initially," *id.* at 159, but Detective Weston told him that he had no choice. *See id.* at 913. The door was left open wide enough for the agents to observe Awadallah (*i.e.,* 60–90 degree angle). *See id.* Awadallah was unable to urinate, however, so he only washed. *See id.* at 913–15. Awadallah and Al–Salmi then prayed together in Awadallah's bedroom for about eight to ten minutes. *See id.* at 89, 915. Agent Rielly and Detective Weston stood inside the room but they did not interfere with the prayer. *See id.* at 20, 88–89, 160.

After Awadallah and Al–Salmi finished praying, Agent Rielly asked Awadallah to sign a form consenting to a search of his apartment and car. *See id.* at 915. Agent Rielly also explained to Awadallah that if he did not sign the consent form, the agents would get a warrant that would allow them to search his home and car.[13]

want to go to the field office and didn't want us to—he could just take some sort of act with his car against the public or against us."); *id.* at 143 (Agent Rielly testifying: "[Awadallah] might, on the way to the field office, try to cause an accident, try to harm the agents in some way."). The officers offered no reason for their belief that Awadallah was dangerous. *See id.* at 333 (Agent Teixeira testifying: "[W]e did not consider him a suspect of anything so there was no reason for us to consider him a suspect, that he would be a fugitive.").

**12.** Awadallah's apartment "wasn't very big. The living room was maybe 15 feet wide and maybe it was 20, 25 feet long." Tr. at 11 (Agent Alston testifying). It had "[a] living room, a kitchen, two bedrooms and two bathrooms." *Id.*

**13.** I credit Awadallah's testimony that this was the first time the agents raised the issue of searching his apartment. *See* Tr. 915–16. While Agent Rielly testified that he obtained Awadallah's oral consent to search while in the parking lot, this testimony is *not* credible. *See id.* at 82. In addition, I credit Awadallah's testimony that he did not read the first consent form but was instead told by Agent Rielly that "this consent is to allow us to search the home." *Id.* at 915. The fact that Awadallah did not read the first form is supported by the uncontested testimony that when he did, in fact, read the *second* consent form at the FBI office, he partially revoked his first consent. He also became upset and stated to Rielly "[w]hy [did] you let me sign the other one and you didn't *explain* it to me that that [sic] one you're going to do this and this?" *Id.* at 916 (emphasis added). Awadal-

*See id.* Moreover, Agent Rielly told Awadallah that if the agents got a warrant, they would "tear up the home." *Id.* at 916. Awadallah signed the consent form because he felt he "had no choice" and he did not want the agents to "mess [ ] up" his property.[14] *Id.*

Before Awadallah was driven to the office, he repeatedly expressed that he did not want to miss his computer class, which started at six o'clock. *See id.* at 916–17. Agent Rielly responded that the FBI would do its best to make sure he returned in time for class. *See id.* at 90, 144–45, 917. Agents Rielly and Kozma then escorted Awadallah to the car and patted him down again before placing him in the back seat of the car. *See id.* at 184. Once inside the car, Awadallah realized that he had forgotten his watch in his home and attempted to open the car door, which was locked. *See id.* at 953. Once Awadallah realized he was locked inside the car, he decided not to ask the agent if he could retrieve his watch. *See id.*

The agents and Awadallah left the apartment complex around 2:45 p.m. and arrived at the San Diego FBI Office around twenty to twenty-five minutes later.[15] *See id.* at 93, 184. The agents took Awadallah to an interview room and offered him something to drink, which he refused because he was fasting. *See id.* at 962. Awadallah sat alone in the room while Rielly conferred with some other agents who wanted Awadallah to sign a consent form to search his second car, a non-working white Honda. *See id.* at 94.

Agent Rielly returned to the interview room and asked Awadallah to sign another consent form to search his white Honda. *See id.* at 1043. Rielly filled out a consent-to-search form and gave it to Awadallah to read. *See id.* When Awadallah read that he had a right to refuse consent, he complained that Agent Rielly had not told him

---

lah would not have become upset and revoked his consent two hours after signing it had he read the first consent form because it stated: "I, Osama Ismail Awadallah, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant *and of my right to refuse consent to such a search* . . . ." GX 3507–I (emphasis added).

**14.** Detective Weston testified that he heard Agent Rielly use the phrase "tear the place up," Tr. at 163–64, but claims that Agent Rielly was explaining that the agents did *not* want to do that. The government argues that "[p]erhaps Awadallah misheard Rielly's statement." Gov't Mem. at 5 n. 4. According to the agents, however, Awadallah never had any difficulty understanding them when they spoke, *see, e.g.,* Tr. at 358 (Agent Reilly affirming on direct examination that "[d]uring the time that [he was] speaking to Mr. Awadallah and the time that [they] were together," he did not "have the impression that [Awadallah] was having any difficulty understanding [him]").

**15.** *See* Tr. at 15, 22 (Agent Alston testifying that she interviewed Al–Salmi in the apartment for "two or three hours," after "11:30 a.m. and that she ended the interview with Al–Salmi "[n]ot too much longer after" Awadallah left). It should be noted that "there [is] an FBI procedure about radioing into the office" whenever agents are transporting someone in their car who is not an FBI agent. Tr. at 275. This procedure requires that the agents radio the office dispatcher with an identification number, time and the mileage on their car when they begin the trip and requires them to repeat the procedure once they arrive. *See id.* at 255 57; *see also* GX 3508 D (FM Radio Station Log). Although this procedure is required, *see* Tr. at 275–77, the government was not able to produce the FM Radio Station log for Thursday, September 20th. *See id.* (AUSA Metzner stating: "We retrieved the radio logs and they do not reflect the time, notwithstanding the fact that the agent said he made them."). Much of the confusion about when Awadallah was driven to the office could have been resolved had the logs recorded the time that Awadallah was driven to the office.

his rights when he signed the first search form. *See id.* at ·916. At approximately 3:50 p.m., Awadallah explicitly revoked his consent to the search of his first car, the gray Honda.[16] *Id.* at 191–92, 1042. Awadallah then signed the consent to search his second car, the white Honda. *See id.* at 1043.

Agent Rielly left the interview room ·and told the agents outside the room, including Agent Kozma, that Awadallah had revoked his consent to search his gray Honda. *See id.* at 96 98, 186–87. Agent Kozma testified that he immediately began trying to reach agents on their "Nextel phones ... to tell them, Hey the consent's been . revoked," but "[i]t took approximately 15 minutes to get a hold of someone who was actually at the search location."[17] *Id.* at 186–87. When Agent Kozma first contacted an agent at the apartment at approximately 4:05 p.m., he was informed that the search had been completed fifteen minutes earlier.[18] *See id.* at 187. Half an hour earlier, at 3:33 p.m., Agents Bedell and McNutt and Secret Service Agent Latulip had begun searching Awadallah's gray Honda. *See id.* at 217–20. They finished searching the car around 3:50 p.m. *See id.* at 129.

From 4:27 to about 4:57 p.m., the same agents searched Awadallah's white Honda. *See id.* at 222–25. From about 4:30 to about 5:20 p.m., FBI Agents Dayhoff and Davis searched Awadallah's apartment. *See id.* at 201–03.

After Awadallah revoked his consent, the agents left him alone in the room "for a long time, for [what felt like] an hour."[19] *Id.* at 955. Awadallah testified that, while waiting, "[he] tried to open the door and call someone from the FBI agents," but he could not open the door. *Id.* at 955. Awadallah could not open the door because it had a two-part bolt mechanism and the door would not open unless a person "turn[ed] the top bolt to the left and then work[ed] the bottom latch" while holding the top bolt in place. *Id.* at 388. The purpose of this bolt mechanism was officer safety; the mechanism allowed the agents to react if a witness or suspect was in need of restraint. *See id.* at 388 89.

Around 4:30 p.m. Agents Teixeira and Godshall began· questioning Awadallah. *See id.* at 269, 306, 364. The agents introduced themselves to Awadallah and told him that they believed that he had information· that could assist them in investigating the events of September 11th.[20] *See*

---

16. I do not credit Agent Kozma's estimate of the time that Awadallah's revocation occurred. *See* Tr. at 191 (Agent Kozma testifying that after he left Awadallah and dealt with Awadallah's revocation of the consent, which took approximately fifteen minutes, "I walked outside, I looked at my watch, and it said 3:56"). If true, the revocation would have occurred at approximately 3:40 p.m.

17. While it would not have made a difference, none of the agents explained why they failed to use their radios to contact the agents at the apartment or Agent Cortes when the revocation occurred. The agents had previously been in radio contact when the agents at the apartment had wanted Awadallah to sign the second consent form. *See* Tr. at 94.

18. At the same time, Agent Rielly drove to the other building housing the FBI's San Diego office, arriving· there about ten minutes after he left the interview room. *See* Tr. at 97. Rielly reported to Agent Cortes, the team leader, that Awadallah had revoked his consent to search the first car. *See id.* at 97–98. Agent Cortes then contacted the agents in the field. *See id.* at 64.

19. I do not credit Awadallah's estimate that the agents left him alone around "5:00 or 5 something," Tr. at 956, because once Agents Teixeira and Godshall began the interview, they did not take a break except to allow Awadallah to pray. *See id.* at 1044.

20. On direct examination, Agent Teixeira testified that he was asked to interview Awadal-

*id.* at 248, 364–65. The agents also told him "that once the questioning was through, [ ]. he would be driven home because of the fact that he did not drive himself to the office." *Id.* at 249. The agents did not advise Awadallah of his rights or inform him that he had a right to leave whenever he wished. *See id.* at 249, 302–03, 305, 365.

The interview at FBI headquarters lasted about six hours and ended "between 10:30 and 11:00" at night. *Id.* at 375. *See also id.* at 957. "[Awadallah] looked at a lot of pictures, he identified the individuals from those pictures, [and] told [the agents] about them." *Id.* at 375. According to the FBI 302 report prepared by Agents Teixeira and Godshall, "Awadallah was shown photographs of suspected hijackers and instantly recognized Nawaf Alhazmi." GX 3505–B at 2. Awadallah told the agents that he saw Al–Hazmi "two to three times a week" while he was employed at the gas station and "stated he interacted with Al-hazmi on two additional occasions." *Id.* at 3. On one occasion, Awadallah went to Al–Hazmi's house to show him "how to access different websites, such as hotmail and MSN" and on another occasion he went to a restaurant with two of his roommates and Al–Hazmi. *Id.* In addition, Awadallah described "another male who was described as slightly taller than Alhazmi, and had a thin build with a little beard." *Id.* at 2–3. "Awadallah did not know the man's name nor did he recognize his picture among the array of photographs." *Id.* at 3. "Awadallah also gave [the agents] a lot of information about himself." Tr. at 375. Among other things, Awadallah described every place he had lived since he moved to

the United States, who his roommates and landlords were (although he often could not remember their full names), from whom he had purchased his cars, and where he had worked. *See* GX 3505–B at 1–8. In sum, "Awadallah was very, very cooperative [that] evening." Tr. at 375 (Agent Godshall testifying). *See also id.* at 270 (Agent Teixeira affirming that "[Awadallah] was fully cooperative"); *id.* at 333 (Agent Teixeira affirming that "[Awadallah] was complacent, compliant, polite, cooperative, not defiant").

At several points during the interview, Awadallah asked Agents Teixeira and Godshall when he would be able to leave. After about one hour of being interviewed (*i.e.,* approximately 5:30 p.m.), Awadallah "mentioned to them that [he had] a class at 6:00" and asked the agents to make sure that he was able to attend it. *Id.* at 957–58. Agents Teixeira and Godshall told him not to worry and that they were "going to do [their] best." *Id.* at 958. When Awadallah raised the issue thirty minutes later, the agents told him that they had called his school and "it was okay for [him] to miss the class." *Id.* at 959. When Awadallah objected, the agents told him that he would "have to stay" with them until the interview was finished. *Id.*

During the interview, Agents Teixeira and Godshall told Awadallah that he had been cooperative and that they believed him but, in order to "clean the table," they wanted him to take a lie detector test. *Id.* at 959–60. The agents originally told Awadallah that he would take the lie detector test that night but later rescheduled it for the next morning because the poly-

lah with Agent Godshall "between noontime [and] early afternoon." Tr. at 245. When asked by AUSA Baker, "At the time that you were asked to participate in the interview, were you told where Mr. Awadallah was at that time?," Agent Teixeira responded, "I be-

lieve he was at a residence on Saranac Avenue, in San Diego." *Id.* He later stated that they were told they would be conducting the interview "approximately an hour before [Awadallah arrived]." *Id.* at 246.

graph examiner was no longer there and they still had questions to ask him. *See id.* at 960–61.

The interview ended around 11:00 p.m. While Awadallah waited outside the FBI office for the agents to drive him home, Agent Teixeira gave Awadallah his business card and told him to call his cell phone if anything happened. *See id.* at 961–62. After the six-hour interview, "there was no reason for [the agents] to consider [Awadallah] a suspect." *Id.* at 333 (Agent Teixeira testifying). Moreover, the agents did not believe that Awadallah was going to flee, and they were "pretty sure" that Awadallah would take the polygraph the next day. *Id.* at 332.

After Agents Teixeira and Godshall drove Awadallah home, he went to his mosque where he saw his three brothers, Jamal, Amin and Aiman. *See id.* at 966. Awadallah discussed what had happened that day and talked about taking a lie detector test the next morning. *See id.* His brothers told him that they were going to hire a lawyer and that he should wait to take the test until he had a lawyer. *See id.* at 966–67. Awadallah's brothers also promised to bring the lawyer to Awadallah at the Friday evening prayer at the mosque. *See id.* at 968. Awadallah agreed with his brothers that he would wait until he had a lawyer before he took the polygraph exam. *See id.* at 967.

## B. September 21, 2001

### 1. Awadallah's Arrest

Around 6:30 a.m. the next morning, Awadallah called Agent Teixeira and told him that he was not going to take the lie detector test until he had a lawyer. *See id.* at 967–68. Agent Teixeira responded

that Awadallah did not need a lawyer and that "there [was] no need for anybody to come with [him]." *Id.* at 968. Agent Teixeira assured Awadallah that it would be "a short test" and that once he took the exam the agents would not bother him anymore. *Id.* Awadallah continued to tell Agent Teixeira that he "preferred to wait until the Friday prayer," but Agent Teixeira repeated that he must take the polygraph exam that morning. *Id.* Moreover, Agent Teixeira said that refusal to take the exam that morning would indicate that Awadallah was hiding something, and Agent Rielly would "get a warrant for [Awadallah] and come and arrest [him]." *Id.* at 969. Believing that he had no choice, Awadallah told Agent Teixeira to pick him up at his apartment. *See id.*

At 7:03 a.m., Agents Teixeira and Godshall drove up to Awadallah's apartment. *See id.* at 277. Awadallah came downstairs and got into the car. Awadallah informed the agents that he wanted to be returned by 11:00 a.m. so that he could attend Friday prayer at the mosque. Agents Teixeira and Godshall said that the polygraph was scheduled for 7:30 a.m., and if Awadallah passed the test he would be home in time for the prayer service. *See id.* at 274–75, 338–39. Awadallah arrived at the FBI office at 7:23 a.m. *See id.* at 277; *see also* GX 3508–D.

Special Agent Antonio Falcon administered the polygraph exam to Awadallah, which began around 7:30 a.m. *See* GX 3503–D. Agent Falcon advised Awadallah of his rights and Awadallah signed an advice-of-rights form at 7:44 a.m. *See* GX 3503–F; Tr. at 970. Agent Falcon then conducted the examination for an "[h]our and a half, two hours," collected his last polygraph chart at 9:36 a.m. and left the room.[21] Tr. at 971; *see also id.* at 422.

---

21. At some point during the exam, Agent Falcon left the room for a few minutes and then returned to complete the test. *See* Tr. at 972.

Agent Falcon returned ten minutes later and told Awadallah that the polygraph showed that he had lied on the following two questions:

(a) Did you know beforehand of any specific plans to destroy any of those U.S. targets, on 9/11/2001? Answer–No.

(b) Did you participate in any way in any of those attacks against U.S. targets, on 9/11/2001? Answer–No.

GX 3503–A (Polygraph Report). *See also* Tr. at 972–73. While confronting Awadallah, Agent Falcon repeatedly encouraged Awadallah to tell the truth, warning that he could be sentenced to prison for five years if he failed to do so. *See* Tr. at 975. After twenty minutes, Agents Teixeira and Godshall came into the room and told Awadallah that he was "one of the terrorists" and he knew about the September 11th attacks in advance. *See id.* at 976. The agents also told Awadallah that nobody could hurt him except them. *See id.* at 976.

Awadallah attempted to stand up, but the agents ordered him: "[S]it down and don't move." *Id.* at 977. Awadallah saw that things were "going wrong," and he "feared that ... they [were] going to do something [to him]." *Id.* Awadallah said he wanted to call his lawyer and his brother, but the agents refused his request. *See id.* The agents continued to question Awadallah, who repeated four or five times

that he had to leave for Friday prayer. *See id.* at 977–78. The conversation became heated and the agents told Awadallah that if he continued to lie, he could go to prison and be deported. *See id.* at 283, 341–42, 348–49, 395. The agents informed Awadallah that he was going to miss Friday prayer and instead they were going to fly him to New York and detain him "for one year" so that they could "find out" more about him.[22] *Id.* at 978. Awadallah demanded to call his lawyer because this was "[his] right," but the agents said: "[H]ere you don't have rights. When you go [to the] MCC or you go to New York, then you [can] ask whatever you want." *Id.*

While Awadallah was being questioned, an AUSA in New York was kept apprised of the situation. *See id.* at 286–87, 384 85, 400–04. At approximately 11:00 a.m., the AUSA instructed the agents to arrest Awadallah as a material witness. *See id.* at 287–88, 351–52, 384. At this point, Agents Darren Fortie and Allan Vitkosky entered the room. *See id.* at 289 90, 353–54, 455–56. Agents Fortie and Vitkosky handcuffed Awadallah, took him downstairs, and photographed and fingerprinted him; they did not inform Awadallah of any of his constitutional rights. *See id.* at 456. The agents allowed Awadallah to call his brother but no one answered; Awadallah was then permitted to call a different telephone number and spoke to his sister-in-

22. I do not credit the testimony that Agent Godshall asked Awadallah "if [he was] served with a subpoena to appear before a grand jury here in New York City, if he would comply with it" and that Awadallah "told [him] no." Tr. at 385. *See also id.* at 401. Awadallah's answer would have been the *most* important fact to have included in the Plunkett affidavit given that section 3144 states "if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person...." 18 U.S.C. § 3144. But

Agent Plunkett's affidavit makes *no* mention of Awadallah being asked this question or of any refusal to testify before a grand jury in New York. Nor did the government mention that Awadallah had refused a request to be subpoenaed when Awadallah appeared before Magistrate Judge Brooks. *See* GX 502. In addition, Agent Falcon, who was in the room with Awadallah until the arrest, testified that he did not recall any conversations about a subpoena. *See* Tr. at 432. Awadallah also testified that the agents did not use the word subpoena. *See id.* at 979.

law. *See id.* at 456–59, 461. The agents took Awadallah to the San Diego MCC, arriving there at approximately 1:45 p.m. *See id.* at 459. Awadallah was booked into the San Diego MCC at approximately 2:04 p.m. *See* GX 702.

## 2. The Government's Application to Arrest Awadallah as a Material Witness

On September 21st, between 5:30 and 6:00 p.m. New York time (2:30 to 3:00 p.m. San Diego time), Agent Plunkett, accompanied by an AUSA, presented an application for a warrant to arrest Awadallah as a material witness to a judge of the Southern District of New York. *See* Plunkett Aff. Based solely on the information contained in the Plunkett affidavit, the judge issued the warrant to arrest Awadallah as a material witness.[23] *See* Tr. at 542, 550, 553, 939–40. The judge was not informed that Awadallah had already been arrested three hours earlier. *See id.* at 542–43.

Agent Plunkett's affidavit stated that the FBI believed that Nawaf Al–Hazmi and Khalid Al–Mihdhar were two of the terrorists who crashed Flight 77 into the Pentagon on September 11th, and that agents had found a car owned by Al–Hazmi in the airport parking lot on the afternoon of September 11th. *See* Plunkett Aff. ¶¶ 7–10. While searching Al–Hazmi's car, agents found various papers owned by Al–Mihdhar. *See id.* ¶¶ 10–11. The affidavit then stated:

> Also found during the search of Nawaf Al–Hazmi's vehicle was a piece of paper, on which the following name and number were written: "Osama 589–5316." The FBI's subsequent search of telephone databases revealed that the telephone call number (619) 589–5316 was subscribed to OSAMA AWADALLAH, 7546 Parkway Drive, La Mesa, California.

*Id.* ¶ 11. Agents had subsequently "located and interviewed OSAMA AWADALLAH in La Mesa, California." *Id.* ¶ 12. Awadallah "admitted knowing Nawaf Al–Hazmi but claimed that he interacted with him on only a few occasions." *Id.* Awadallah "also admitted being associated with the (619) 589–5316 telephone number, but expressed surprise that his name and phone number were found in Nawaf Al–Hazmi's car in Dulles Airport." *Id.* The affidavit further stated that, during a search of Awadallah's vehicles, agents found two videotapes concerning the 1993 war in Bosnia and another videotape about the Koran. *See id.* ¶ 13. Finally, "[a] consent search of AWADALLAH's apartment uncovered a box-cutter and several computer-generated photographs of Usama bin Laden." *Id.*

Agent Plunkett also asserted that "it may become impracticable to secure the presence" of Awadallah because "he continues to maintain substantial family ties in Jordan and elsewhere overseas," which "make him a risk of flight while his admitted connection to the highjackers [sic] is under investigation." *Id.* ¶ 15. "In addition, given AWADALLAH's connections to one or more of the hijackers who committed the terrorist attacks ... AWADALLAH may have an incentive to avoid appearing before the grand jury." *Id.* "AWADALLAH may also be concerned that his prior conduct, as set out above, may provide a basis for law enforcement authorities to investigate and possibly prosecute him." *Id.*

---

**23.** Neither the AUSA nor Agent Plunkett presented any additional information to the court. *See* Tr. at 550, 937 40, 947–49.

Plunkett's affidavit did not include a number of facts already known to the FBI when the warrant application was made. For example, the FBI knew that Al–Mihdhar had left San Diego over a year earlier, around June of July of 2000, and Al–Hazmi had left shortly thereafter. *See* Tr. at 944. Moreover, they knew that the phone number that the agents found in Al Hazmi's car had ceased being Awadallah's phone number almost two years earlier. *See id.* at 935, 946. In addition, the application mistakenly stated that a push-up razor, which Plunkett labeled a "box-cutter," was found in Awadallah's apartment when, in fact, it was found in his non-working white Honda.[24] *See id.* at 224; *see also* GX 3510 B (Agent Bedell's 302 report).

With respect to Awadallah's potential flight risk, the application did not state that "Awadallah was very, very cooperative [the previous] evening." Tr. at 375 (Agent Godshall testifying). *See also id.* at 270 (Agent Teixeira affirming that "[Awadallah] was fully cooperative"); *id.* at 333 (Agent Teixeira affirming that "[Awadallah] was complacent, compliant, polite, cooperative, not defiant"). Nor did the affidavit or application note that, when the agents returned Awadallah to his home on September 20th, they had no fear that he would attempt to flee even though he was scheduled to take a lie detector test the next morning. *See id.* at 272–73, 332, 960. Finally, the application failed to mention Awadallah's ties to the United States, including the fact that he had three brothers who lived in San Diego, one of whom was an American citizen who had lived in San Diego for fifteen years.

## III. THE ARREST WARRANT WAS IMPROVIDENTLY ISSUED DUE TO INTENTIONAL MISREPRESENTATIONS AND OMISSIONS

Assuming, *arguendo,* that the material witness statute applies to grand jury witnesses, the question for the Court is whether Awadallah was appropriately detained in accordance with the requirements of that statute. The statute sets forth two explicit requirements for ordering the arrest of a material witness: (1) "the testimony of [the] person is material" and (2) "it is shown that it may become impracticable to secure the presence of the person by subpoena." 18 U.S.C. § 3144.

Section 3144 is silent as to what standard a court should use to decide whether "the testimony of [the] person is material" and whether "it may become impracticable to secure the presence of the person by subpoena." *Id.* One federal court has suggested that the standard should be "probable cause to believe" that these conditions are met. *Bacon v. United States,* 449 F.2d 933, 943 (9th Cir.1971). Probable cause, of course, is generally used in the context of authorizing the arrest of a suspected criminal or authorizing a search to obtain evidence of criminal conduct. Whether the same standard should be used to arrest a

---

**24.** The government argues that "if anything, the error favor[ed] Awadallah, because the box-cutter's presence in his car could [have] suggest[ed] that he was taking it somewhere for some purpose." Gov't Mem. at 64. However, the fact that the razor was found inside Awadallah's *non*-working car in the parking lot implies the exact opposite. The warrant application also failed to state that, according to the agents' reports, Awadallah claimed that the push-up razor was a carpet cutter which he had used "to cut the carpet he recently installed in his apartment," GX 3508–A at 8, and that at least two neighbors had seen "residents of unit 38 at 7200 Saranac ... replace the carpet in an older model van" in the parking lot on September 14th. GX 3507–F. *See also* GX 3507–G. If anything, *these* facts would reasonably suggest that after Awadallah's roommates used the carpet cutter on September 14, they stored it in his car in the parking lot.

material witness is open to debate. In any event, for the limited purpose of determining whether the arrest warrant was improvidently issued, I shall apply the probable cause standard.

 The materiality requirement is problematic in a grand jury context, which is, by definition, secret. *See* Fed.R.Crim.P. 6(e)(2); *see also Awadallah III*, 202 F.Supp.2d at ——. Nonetheless, because there is no real way for a court to assess whether the testimony of a person is "material" to a grand jury proceeding, I shall accept the view of the *Bacon* court that "a mere statement by a responsible official, such as the United States Attorney, is sufficient to satisfy [the materiality prong]." *Bacon*, 449 F.2d at 943.

In this case, however, the affidavit fails to comply even with this requirement because it was submitted by Agent Plunkett based solely upon his personal knowledge.[25] Plunkett may have been able to assess the materiality of Awadallah's knowledge to the FBI's investigation. But he could not have made an informed judgment about the materiality of Awadallah's testimony to the grand jury's investigation as he was never present in the grand jury. *See* Fed.R.Crim.P. 6(d)(2). The only officials who may be able to make an informed decision about a witness's materiality to the grand jury's investigation are "[a]ttorneys for the government ... [who] may be present while the grand jury is in session."[26] Fed.R.Crim.P. 6(d)(1).

 The second prong also presents a serious problem. Plunkett's affidavit, submitted in support of the arrest warrant application, offered the court four reasons to conclude that "it may become impracticable to secure [Awadallah's] presence ... by subpoena." *See* Plunkett Aff. ¶ 15(a)-(c). These reasons were: (1) Awadallah came from Jordan and maintained family ties to that country; (2) his "substantial overseas ties" made him a "risk of flight"; (3) his connection to "one or more of the hijackers" gave him an "incentive to avoid appearing before the grand jury"; and (4) he might have been concerned that his "prior conduct" would provide a basis for law enforcement officers to "investigate and possibly prosecute him." *Id.* These statements are misleading. In addition, the agent failed to inform the court that Awadallah had been fully cooperative with the authorities. *See supra* Part II.A.

The affidavit were misleading for four reasons. *First*, the affidavit fails to tell the court that Awadallah also had substantial ties to San Diego—namely, three of his brothers, including one who is an American citizen, permanently resided there. *Second*, there was no "prior conduct" that would offer any basis for possible prosecution of Awadallah. *Third*, the agents failed to inform the judge that Awadallah had been very cooperative on

---

**25.** *See* Plunkett Aff. ¶ 6 ("As part of the investigation in this matter, *I have* debriefed other agents and law enforcement officers who have been involved in this investigation, and *I have* reviewed relevant reports, documents and records in this investigation. Because the limited purpose of this affidavit is to support the issuance of the requested warrant, *I have* not set forth all the facts known to me, or to other agents or law enforcement personnel concerning this nationwide investigation. *I believe* the testimony of OSAMA AWADAL-

LAH would be material to the grand jury's investigation ....") (emphasis added).

**26.** It is important to remember that in *Bacon*, the Ninth Circuit already shifted the duty to assess materiality from the court to the prosecutor. To then shift the duty to determine materiality from the court to the prosecutor to an FBI agent guts sections 3144's requirement that "a judicial officer may order the arrest of the person" if it appears that the testimony of the person is material. 18 U.S.C. § 3144.

September 20 and September 21, agreeing to searches of his home and vehicles, voluntarily accompanying them to their office for an interview, voluntarily returning to the office the next morning, and voluntarily submitting to a polygraph examination without the presence of an attorney. *See supra* Part II.A. *Fourth,* and finally, the agents failed to inform the court that the phone number found in the hijacker's car had not been used by Awadallah for eighteen months and was last used at a prior residence.[27] If the misleading information had been removed and the omitted information disclosed, it is overwhelmingly likely that the court would have found that Awadallah's presence at the grand jury could have been secured by a subpoena.[28]

In *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that if a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in a search warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held. The purpose of the hearing is to allow the defendant to establish by a preponderance of the evidence that the false statements were intentionally made or with reckless disregard for the truth and that the false statement is necessary

to the finding of probable cause. *See id.* at 156, 98 S.Ct. 2674. If this showing is made, the evidence seized pursuant to the warrant must be suppressed. *See id.* at 170–71, 98 S.Ct. 2674. At least four Circuits have extended the *Franks* holding to arrest warrants. *See Kelly v. Curtis,* 21 F.3d 1544, 1554 (11th Cir.1994); *United States v. Colkley,* 899 F.2d 297, 301 (4th Cir.1990); *Stewart v. Donges,* 915 F.2d 572, 581–82 (10th Cir.1990); *United States v. Martin,* 615 F.2d 318, 328 (5th Cir.1980). *Franks* has also been extended to cover material omissions in addition to affirmative misstatements. *See, e.g., United States v. Canfield,* 212 F.3d 713, 717–18 (2d Cir.2000); *United States v. Bianco,* 998 F.2d 1112, 1125 (2d Cir.1993). Thus, if Awadallah has shown that the misleading statements and the omissions in the arrest warrant application misled the court into issuing this arrest warrant, the grand jury testimony must be suppressed as the fruits of an unlawful detention.

The issues raised here were fully explored at the evidentiary hearing held on February 15–18. While not denominated a *Franks* hearing, the four-day evidentiary hearing allowed for full testimony by Agent Plunkett as to the preparation of the affidavit and arrest warrant application and its presentation to the court. *See* Tr. at 933–52. A review of his testimony, in conjunction with a review of the affidavit

---

**27.** The affidavit is also misleading when it describes Awadallah's "Connection to Nawaf Al-Hazmi, Khalid Al Midhar [sic], and Others [sic]." Plunkett Aff. at 5. As part of this "connection," the affidavit refers to a push-up razor, which was found in Awadallah's nonworking car as a "box cutter" discovered during a search of his home. The affidavit did not inform the court that Awadallah had explained to the agents that the razor was a carpet cutter that he had used "to cut the carpet he recently installed in his apartment," GX 3508–A at 8. *See also supra* notes 23–24. Nor does the affidavit inform the court that

two neighbors had seen "residents of unit 38 at 7200 Saranac . . . replace the carpet in an older model van" a week earlier, which corroborated Awadallah's description of the razor. GX 3507 F.

**28.** The information contained in the warrant application represents the extent of the information given to the court. *See* Tr. at 937–40, 947–49 (testimony of Agent Plunkett that very little was said when he presented the warrant application and the court asked no questions of him). *See also supra* note 23.

submitted in support of the warrant, reveals that there were both misrepresentations and omissions in the affidavit, and that this was not a result of mistake or accident.

At the February 15–18 evidentiary hearing, the agents were anxious to convince this Court that Awadallah had voluntarily consented to searches of his home and cars and had voluntarily spoken with them in their offices.[29] The two agents who testified about Awadallah's demeanor repeatedly stated that he was very cooperative. *See* Tr. at 270, 333, 375, 392. Yet, the judge who signed the warrant was never informed by the government that Awadallah had been cooperative in the investigation. In addition, after questioning Awadallah for hours on September 20, the agents permitted him to return home and trusted that he would voluntarily appear for a polygraph examination the next morning, which he did. He was not guarded or surveilled overnight. Once again, this information was not disclosed to the court. There is also no dispute that the agents were aware at the time of the warrant application that the telephone number found in the car was no longer in use and had not been used for some eighteen months. *See id.* at 946. This, too, was not disclosed to the court. Finally, there was no "prior conduct" by Awadallah that would subject him to prosecution, as the agents well knew.

■ The final inquiry under *Franks* is whether there was probable cause to search or arrest the individual at the time the warrant was issued, when the evidence available at that time is analyzed after deleting the misrepresentations and including any omissions. *Franks*, 438 U.S. at 156, 171–72, 98 S.Ct. 2674. I conclude that, had there been full disclosure, a neutral judicial officer would not have found probable cause to believe that "it may become impracticable to secure [Awadallah's] presence ... by subpoena."[30] 18 U.S.C. § 3144. *See State v. Murphy*, No. CA88–08–064, 1989 WL 59028, at *3 (Ohio App. June 5, 1989)("[T]he trial court correctly suppressed the evidence ... since

---

**29.** When the government seeks to defeat Awadallah's claim that he was unlawfully seized and coerced into giving his consent to search, it emphasizes the "cooperative atmosphere that had yielded the information Awadallah had already provided," Gov't Mem. at 10 n. 17, and claims that the "[t]he tone of the interview was relaxed and Awadallah was cooperative," *id.* at 11. *See also id.* at 47 ("Awadallah's statements to Mr. Hamud soon after his arrest ... demonstrate, as Mr. Hamud repeatedly told the court, that he was fully cooperative at all times.").

But when the government sought to detain Awadallah it failed to mention his extensive cooperation with the authorities. Nor did the prosecutors describe Awadallah's cooperation during his detention hearing before Magistrate Judge Brooks. This omission is particularly glaring given that Hamud continually emphasized Awadallah's cooperativeness when arguing that he should not be detained. *See* GX 501 at 2 ("[t]hey merely were volunteering—volunteer witnesses, cooperated when questioned by the FBI and answered all their questions"); *id.* ("[t]hese men were basically volunteer witnesses, cooperated fully and completely with the FBI"); *id.* at 6 ("all they did was cooperate with a federal agency"); *id.* at 7 ("[t]hese people were cooperating witnesses"). Moreover, the government now argues that Awadallah was properly detained as a material witness, and his testimony should not be suppressed, because he was "an *uncooperative* witness with material information." Gov't Mem. at 59 (emphasis added). The government cannot have it both ways—either Awadallah was cooperative or uncooperative.

**30.** Although Magistrate Brooks found that there was "probable cause" to believe that Awadallah's testimony would be impracticable to secure by subpoena, this decision was made without the government's admission that he had been "cooperative" throughout the process. *See supra* note 29; *see also supra* Part II.A.

the affidavit, without the knowingly false statements, was insufficient to establish probable cause.") (unpublished).[31] *Cf. United States v. Blackmon*, 273 F.3d 1204, 1208 (9th Cir.2001) (suppressing evidence pursuant to wiretap application in part because "purged of the material misstatements and omissions, the application contains only generalized statements that [do not] satisfy the requirements of [the wiretap statute]").[32]

Because this warrant was wrongfully obtained, the fruits of the unlawful arrest must be suppressed. This, of course, includes the grand jury testimony, which occurred after twenty days of continuous wrongful detention. If Awadallah had appeared before the grand jury pursuant to subpoena, his testimony might well have been different. *Awadallah III*, 202 F.Supp.2d at ——.

## IV. ALL OF THE EVIDENCE SEIZED AND ALL OF AWADALLAH'S STATEMENTS MUST BE SUPPRESSED

Awadallah has moved to suppress all statements that he made to the agents on September 20th as well as any physical evidence found during the search of his home and cars because: (1) the FBI agents unlawfully seized him; (2) the unlawful seizure tainted both the statements he made to law enforcement officers and his consent to search his apartment and cars; and (3) even if he was not seized, his consent to the searches of his apartment and cars was the product of coercion. Awadallah has also moved to suppress any statement that he made after the polygraph examination was administered on September 21st. For the reasons set forth below, the motion is granted.

### A. Legal Standard

#### 1. Seizure of a Suspect

 "As our [Fourth Amendment] cases make clear, there are three levels of interaction between agents of the government and private citizens," with each level requiring a different degree of justification. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir.1995). *First*, the police may initiate a voluntary encounter with an individual and ask questions as long as the person is willing to listen. *See Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir.2000), *cert. denied*, —— U.S. ——, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001). Such an encounter does not constitute a seizure and therefore does not require any justification or "trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). *Second*, the police may briefly detain a person as part of an investigation (*i.e.*, engage in a *Terry* stop) if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"[33] *United States v. Sokolow*, 490

**31.** This decision may be cited by this Court. *See* Oh. St. Rpt. Opinions Rule 2(G).

**32.** Although there is a dearth of cases in which courts have found a *Franks* violation, the Supreme Court could not have created an illusory right.

**33.** "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quotation marks and citations omitted). "This circuit has characterized the quantum of suspicion necessary ... as 'reasonable suspicion, based on specific and articulable facts, of unlawful conduct.'" *United States v. Bayless*, 201 F.3d

U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). *Third*, the police may arrest an individual if they have probable cause to believe that he has committed a felony or a criminal offense in the police's presence. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). A consensual encounter ripens into a seizure, whether an investigative detention or an arrest, when a reasonable person under all the circumstances would believe he was not free to walk away or otherwise ignore the police's presence. *See United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir.1992). "The test is an objective one based on how a reasonable innocent person would view the encounter." *Id.* (citations omitted).

### 2. Search of a Suspect or His Property

The Fourth Amendment also "generally requires police to secure a warrant before conducting a search." *Maryland v. Dyson*, 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam). Warrantless searches "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041,

36 L.Ed.2d 854 (1973). *See also Anobile v. Pelligrino*, 274 F.3d 45, 61 (2d Cir.2001).

### 3. Burden of Proof

■ Once a defendant establishes a basis for a suppression motion, the government must prove that the search was proper by a preponderance of the evidence. *See United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983).

### B. Discussion

### 1. Awadallah Was Unlawfully Seized on September 20th

■ The Fourth Amendment prohibits "seizures" that are unreasonable. U.S. Const. amend. IV. "Obviously," as common experience and common sense show, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. The Supreme Court has repeatedly held that law enforcement officers may approach an individual and ask questions of him because "*mere* police questioning does not constitute a seizure." *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382 (emphasis added). *See also Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Royer*, 460 U.S. at 497, 103 S.Ct. 1319 (plurality opinion);

116, 132 (2d Cir.2000) (quoting *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.1994)). "Reasonable suspicion is an objective standard; hence, the subjective intentions or motives of the officer making the stop are irrelevant." *Id.* at 133. Finally, "the investigative methods employed should be the *least intrusive* means reasonably available to verify or dispel the officer's suspicion in *a short period of time*." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (emphasis added).

*Mendenhall,* 446 U.S. at 552–55, 100 S.Ct. 1870.

Although not all contact between the police and citizens is unlawful, the Fourth Amendment stands as a protection against " 'arbitrary and oppressive interference by enforcement officials with the privacy and personal security' " *Delgado,* 466 U.S. at 215, 104 S.Ct. 1758 (quoting *United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)). Thus, law enforcement officers may not "convey a message that compliance with their requests is required," *Bostick,* 501 U.S. at 435, 111 S.Ct. 2382, or "by means of physical force or show of authority" restrain a person's liberty if they are questioning a person on a consensual basis. *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868. A consensual encounter turns into a seizure when a reasonable person would no longer feel free "to ignore the police presence and go about his business." *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382 (quotation marks and citation omitted).

In this case, the government does not contend that the agents had probable cause, or even reasonable suspicion, to believe that Awadallah had committed a crime. Therefore, the sole question is whether he was seized. If so, the agents violated Awadallah's Fourth Amendment rights.

While the totality of the circumstances must always be considered in determining whether an encounter with the police constitutes a seizure, courts have recognized several factors as relevant to this inquiry. Such factors include:

the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Brown,* 221 F.3d at 340. *See also Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870 (listing "[e]xamples of circumstances that might indicate a seizure"). In addition, courts should consider "whether a suspect is or is not told that she is free to leave" and "whether the [person] is searched, frisked, or patted down," and "the length of the interrogation." *Tankleff v. Senkowski,* 135 F.3d 235, 244 (2d Cir.1998) (citations omitted).

A consideration of these factors shows that Awadallah was clearly not "free to ignore" the presence of the FBI. Three FBI agents immediately confronted Awadallah after he drove into his parking lot. Two more agents were stationed at the bottom of the stairs to his apartment "to provide crowd control," and three other agents were standing in the parking lot. Tr. at 170, 903. Moreover, Agent Rielly informed Awadallah that he was required to speak with the agents at the FBI office, as opposed to his home, and further instructed him to leave his car at the apartment because the agents were going to drive him. At no point over the six hours that Awadallah was questioned did an agent inform Awadallah that he was free to leave whenever he wanted. Finally, although Awadallah told the agents he had to be at class by 6 p.m. (and the encounter began around 2 p.m.), the agents told him they "called [his] school" to say that Awadallah would miss the class and he would "have to stay with [them] until [they] finish[ed][the] interview." *Id.* at 958.

▮ The agents repeatedly frisked Awadallah. This is not only another factor that shows he was seized but also a flagrant violation of the Fourth Amendment. "A pat down is unquestionably a search

covered by the Fourth Amendment." *Leveto v. Lapina*, 258 F.3d 156, 163 (3d Cir. 2001). "It is," in fact, "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." [34] *Terry*, 392 U.S. at 17, 88 S.Ct. 1868. Law enforcement officers may initiate a consensual encounter, "[b]ut during such police-citizen encounters, an officer is not entitled, without additional justification, to conduct a protective search." *United States v. Burton*, 228 F.3d 524, 528 (4th Cir.2000).

While the government claims the patdowns were done for "security reasons," Gov't Mem. at 5 (citing Tr. at 91, 141), it does not attempt to justify, with specific and articulable facts, the grounds for the frisks. Indeed, the only articulable fact was that agents had found a phone number in Al–Hazmi's car which had, as the agents knew, belonged to Awadallah eighteen months earlier. But, " 'a person's mere propinquity to others independently suspected of criminal activity,' create[s] neither probable cause nor reasonable suspicion." *Tehrani*, 49 F.3d at 59 (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). *See also United States v. Coggins*, 986 F.2d 651, 655 (3d Cir.1993) ("Mere association with a known criminal cannot on its own be a basis for a 'reasonable suspicion.' ") (citation omitted). Nothing in the FBI's investigation of Awadallah over the previous few days had given the agents any reason to think that Awadallah was armed or violent when they approached him on September 20th. At best, the agents were operating on a hunch (which turned out to be wrong) or in an excess of caution. Such reasons have been rejected as insufficient for invading a person's privacy, especially during an encounter that is supposed to be consensual. [35] *See Ybarra*, 444 U.S. at 94, 100 S.Ct. 338 ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked. . . ."); *Leveto*, 258 F.3d at 164 (collecting cases and stating "a pat down is lawful when, under the circumstances, an officer has a reasonable belief that the subject is armed and dangerous").

Preventing Awadallah from entering his own home and ordering him to keep the bathroom door open while he tried to urinate was even more egregious. Of course, just as the Constitution may permit a patdown when supported by reasonable suspicion that the person is armed, there are limited circumstances under which it may be reasonable to prevent a person from entering his own home. In this case, the government argues: "If the agents did briefly prevent Awadallah from entering the apartment, it was for the wholly permissible reason of ensuring that the ongo-

---

34. "Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a 'petty indignity.' " *Terry*, 392 U.S. at 16–17, 88 S.Ct. 1868. This assumption would be particularly absurd here because Awadallah was patted down in front of his home, presumably within sight of his neighbors.

35. As Justice Harlan explained in *Terry*: Any person, including a policeman, is at liberty to avoid a person he considers dangerous. If and when a policeman has a right instead to disarm such a person for his own protection, he must *first* have a right not to avoid him but to be in his presence. That right must be more than the liberty (again, possessed by every citizen) to address questions to other persons, for ordinarily the person addressed has an equal right to ignore his interrogator and walk away; *he certainly need not submit to a frisk for the questioner's protection.* *Terry*, 392 U.S. at 32–33, 88 S.Ct. 1868 (Harlan, J., concurring) (emphasis added).

ing interview and search would not be disrupted." Gov't Mem. at 44. But this justification pales in comparison to the only reason that the Supreme Court has recognized as sufficient for excluding an individual from his own home. *See Illinois v. McArthur,* 531 U.S. 326, 336, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (holding that the police's refusal to allow a suspect to enter his home while the police obtained a search warrant constituted a reasonable seizure because the defendant would destroy evidence if allowed inside the house). Absent extraordinary circumstances, a person's right to enter his own home will always trump the government's preference that an interview not be interrupted. The agents also crossed the constitutional boundaries of acceptable police behavior when they ordered Awadallah to keep the bathroom door open so that the agents could watch as he urinated and washed himself. This is especially true given that "homes receive the *highest* Fourth Amendment protections." *Anobile,* 284 F.3d at 117 (emphasis added). *See also* U.S. Const. amend. IV ("The right of the people to be secure in *their ... houses ...* shall not be violated ...") (emphasis added).

All of these events, which occurred before Awadallah had signed the consent-to-search form or made any significant statements, show that Awadallah was unlawfully detained by the agents. Indeed, the tactics employed by the agents in this case are remarkably similar to the ones used in *United States v. Ceballos,* 812 F.2d 42 (2d Cir.1987), where the Second Circuit found it proper to suppress evidence obtained pursuant to an unlawful seizure. In *Cebal-*

*los,* a supervisor summoned his employee, Efrain Adames, to his office at the request of a Secret Service agent investigating potential counterfeiting. *See id.* at 44. "When Adames came to the office, [Secret Service] Agent Powers flashed his badge and told Adames that [the agents] wished to take him to their office for questioning." *Id.* at 47. "Though the agents offered to delay Adames' trip to their field office for a half hour, until his shift ended .... [t]his initial encounter seems to have created a *stronger* implication of legal obligation than in *Florida v. Royer,*" a case in which a Supreme Court plurality held that the police unlawfully seized an individual by asking him to accompany them to a small police room at the airport while holding his airline ticket. *Id.* at 48 (citing *Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229) (emphasis added). "The initial impression of obligation to accompany the agents was compounded" when the agents denied "Adames' request to follow them in the company van." *Id.* What *Ceballos* makes clear is that "a request to appear at a police station 'may *easily* carry an implication of obligation, while the appearance itself, unless clearly stated to be voluntary, may be an awesome experience for the ordinary citizen.'" *Id.* (quoting *Model Code of Pre–Arraignment Procedure* § 110.1 commentary at 261 (1975)) (emphasis added). *See also Dunaway v. New York,* 442 U.S. 200, 207 n. 6, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (quoting same commentary).

In this case, the agents impressed upon Awadallah the same sense of urgency as the agents in *Ceballos* by stating that they "needed" to talk with him at their office.[36]

---

**36.** The government has argued: "Encounters that begin in public places but subsequently move to a police station or office with the consent of the defendant do not necessarily result in a seizure." Gov't Mem. at 43 (citing

*United States v. Torres,* 949 F.2d 606, 608 (2d Cir.1991); *United States v. One Lot of United States Currency ($36,634),* 103 F.3d 1048, 1053 (1st Cir.1997)). Those case are easily distinguishable, however, because the en-

Any doubt that this was *not* a request, but an order, was erased when Awadallah asked why he could not be interviewed at the apartment and Agent Rielly responded by denying his request, refusing to permit him to drive his own car, and insisting that he drive in the agents' car.[37]

Everything that followed this initial encounter only further confirmed what would have been obvious to a reasonable person in Awadallah's situation: Awadallah was not at liberty to ignore the agents until they were done questioning him.[38] Indeed, when Awadallah explicitly asked to leave so that he could attend his computer class, the FBI agents denied the request and told him that he would "have to stay" with them until the interview was finished. *See* Tr. at 959.

Because the FBI agents amply conveyed the message that compliance with their requests was required, any statements given on September 20th are the product of this unlawful seizure and must be suppressed. *See Ceballos,* 812 F.2d at 49 ("Having concluded that the ... agents placed [the defendant] in custody without probable cause and in a manner exceeding the limits of *Terry* ... the consents to search and the *statements* given were too closely connected in context and time to the illegal [seizure] to break the chain of illegality.") (emphasis added).

### 2. The Unlawful Arrest Tainted Awadallah's Consent

 When consent to a search is tainted by an illegal seizure, it is invalidated. *See Royer,* 460 U.S. at 507–08, 103 S.Ct. 1319 (holding that because the individual "was being illegally detained when he consented to the search of his luggage ... the consent was tainted by the illegality"). Here, Awadallah's consent to search his home and cars was tainted because there was no break in the causal chain between the illegal detention and that consent. *See Ceballos,* 812 F.2d at 50. Awadallah was never informed of any of his rights, the consent was given during the unlawful detention, there were no intervening events, and "[t]he illegality ... had a quality of purposefulness." *Brown v. Illinois,* 422 U.S. 590, 605, 95 S.Ct. 2254,

counters moved to an office "a few feet away" from where the questioning of defendant began, *Torres,* 949 F.2d at 607, or to an office located in the same airport, *see One Lot,* 103 F.3d at 1052. In contrast, Awadallah was transported to an office located miles away from his home. Unlike the individuals in *Torres* and *One Lot,* Awadallah could not easily have walked away from the FBI office and thereafter ignored the police. *See infra* note 38. I do not hold that consensual encounters that move to police offices "necessarily" result in a seizure. Rather, this Court's holding rests upon the well-established proposition that when the police convey a message that compliance with their "request" is required, or otherwise restrain the liberty of the individual being questioned, the encounter is not consensual.

37. In concluding that the defendant was seized, the Second Circuit in *Ceballos* emphasized "the agents' omission of any statement

conveying to Adames a choice in the matter." 812 F.2d at 48. The court further commented that the Model Code recommends "law enforcement officers 'take such steps as are reasonable under the circumstances *to make clear* that there is no legal obligation to comply [with a request to appear at a police station].'" *Id.* at 48 n. 3 (citing *Model Code of Pre–Arraignment Procedure* § 110.1(3) (1975)) (alteration in original) (emphasis added).

38. In fact, if Awadallah wanted to return home, he certainly could not have *ignored* the agents because he did not have a car at the office. Instead, he would have had to ask the agents to drive him back or, at the very least, ask their permission to use a phone in order to call for a ride home. It is also notable that the one time Awadallah did try to leave the interview room, he was not able to open the door.

45 L.Ed.2d 416 (1975). *See also United States v. Montilla*, 928 F.2d 583, 590 n. 3 (2d Cir.1991) (describing factors to consider in determining whether consent was tainted); *United States v. Oguns*, 921 F.2d 442, 447–48 (2d Cir.1990) (same); *Ceballos*, 812 F.2d at 50–51 (same); *United States v. Patzer*, 277 F.3d 1080, 1084 (9th Cir.2002) (same).

### 3. Awadallah's Consent on September 20th Was Involuntary

■ Even assuming, *arguendo*, that Awadallah was not unlawfully seized, the consent he gave to search his home and cars was nonetheless involuntary. "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. *See also Mendenhall*, 446 U.S. at 557, 100 S.Ct. 1870. "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995) (citing *United States v. Sanchez*, 32 F.3d 1330, 1334–35 (8th Cir.1994)). *See also United States v. Lavan*, 10 F.Supp.2d 377, 384 (S.D.N.Y.1998). "Recent Supreme Court decisions emphasize ... that the issue of reasonableness is to be measured by an objective standard." *Garcia*, 56 F.3d at 423. When determining "objective reasonableness," the court asks: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 183–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).

■ "Of course, this objective standard does not preclude an assessment of the particularities of the situation that [are] presented in any given case. On the contrary, it is still the totality of the circumstances that must be considered." *Garcia*, 56 F.3d at 423. Thus, "[i]n applying this test, it is appropriate to consider the particularities of the situation that [are] presented in any given case and the possibly vulnerable subjective state of the person who consents." *Lavan*, 10 F.Supp.2d at 384 (quotation marks and citations omitted). Other relevant factors include:

whether the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent.

*Id.* (citations omitted).

In this case, several factors show that Awadallah's consent was the product of duress or coercion. The agents repeatedly made "a show of force" by: (1) telling him that he could not drive his own car; (2) frisking him; (3) refusing to let him inside his apartment; and (4) ordering him to keep the bathroom door open while he tried to urinate. Agent Rielly also said that the agents would get a warrant if Awadallah did not sign the consent form, thereby implying that it was futile for Awadallah not to sign the form. Moreover, Agent Rielly explicitly threatened to "tear up" the apartment if he did get a warrant. Finally, the agents failed to inform Awadallah that he had a constitutional right to refuse any searches when they presented him with the first consent form. *See supra* note 13.

Of course, Awadallah *did* partially revoke his consent to search his gray Honda when Agent Rielly presented him with the second consent form and Awadallah read it. *See* Tr. at 950. At that point Awadal-

lah knew his rights. This one fact, however, does not overcome the coercive tactics that the agents had previously used. Awadallah's decision to sign the second consent form was still made in the context of having been previously threatened and told what to do.

Under these conditions, the agents lacked any reasonable basis to believe that Awadallah's consent to search his property was "the product of an essentially free and unconstrained choice." *Schneckloth*, 412 U.S. at 225, 93 S.Ct. 2041. Because any evidence seized from his home or cars was the product of an unlawful search, such evidence must be suppressed. *See Awadallah*, 202 F.Supp.3d at —— — ——.

### 4. September 21st: Awadallah Was Unlawfully Seized After the Polygraph Exam

▮ The government has informed the Court that it "currently plans to offer at trial statements made by Awadallah during the post-polygraph interview on September 21, 2001." 4/2/02 Letter From AUSA Robin Baker to the Court. However, any statements made by Awadallah after the polygraph examination, but prior to the issuance of the arrest warrant,[39] must be suppressed because any such statements were made while Awadallah was unlawfully seized.

After Agent Falcon finished administering the polygraph, he encouraged Awadallah to tell the truth about his supposed connection to the September 11th attacks by threatening to send him to prison for five years for lying. Agents Teixeira and Godshall then accused him of being one of the September 11th terrorists and told him

to sit down and not move. The agents threatened to fly him to New York and detain him for one year in order to find out more about him. When Awadallah asked to call his lawyer, the agents initially refused his request. *See supra* Part II.B.

Under these circumstances, a reasonable person in Awadallah's situation would not have felt free to walk away or otherwise ignore the FBI agents. Awadallah was effectively seized. Because the government does not contend that the agents had probable cause to believe that Awadallah had committed any crimes, the seizure of Awadallah was unlawful. *See Atwater*, 532 U.S. at 354, 121 S.Ct. 1536 (holding that an officer may only arrest a person without a warrant if there is probable cause to believe the person has committed a felony or a crime in the officer's presence). Any statements that Awadallah made are tainted by this unlawful arrest and must be suppressed. *See supra* Part IV.B.2.

## V. PERJURY TRAP

▮ In an earlier Opinion, this Court raised the issue of whether Awadallah was the victim of a perjury trap. *See Awadallah II*, 202 F.Supp.3d at —— — ——. The parties have now addressed this issue. After reviewing these submissions, I cannot conclude that the government violated defendant's Fifth Amendment right to due process by setting a perjury trap.

Some defenses, although graced with a name, seem to be illusory. "The recantation defense," for example, "appears to be an illusion often asserted but never found." *Id.* at ——. The same can be said of "perjury trap." In case after case, the courts in this Circuit have recognized that

---

**39.** According to the Government: "Awadallah made *no statements* during the few hours of his warrantless detention [after Agents Fortie and Vitkosky took custody of Awadallah], so no trial evidence can be said to be derived

from the warrantless arrest, and his motion may be denied on that basis." Gov't Mem. at 56 (emphasis added). *See also* Reply Mem. at 5.

a perjury trap could *theoretically* exist but nonetheless found that "the facts of [the particular] case render[ed] the perjury trap defense inapplicable." *United States v. Regan,* 103 F.3d 1072, 1079 (2d Cir.1997) (citations and quotations omitted). *See also Wheel v. Robinson,* 34 F.3d 60, 67–68 (2d Cir.1994)("All of these cases recognized the possibility of a 'perjury trap' doctrine, but in each case the court concluded that the defendant's due process rights were not violated. . . . We reach the same conclusion in this case, and accordingly do not decide whether the 'perjury trap' defense is available in the Second Circuit.") (referring to *United States v. Chen,* 933 F.2d 793, 796–97 (9th Cir.1991); *United States v. Simone,* 627 F.Supp. 1264, 1268 (D.N.J.1986); *United States v. Crisconi,* 520 F.Supp. 915, 920 (D.Del. 1981); and *United States v. Catalano,* No. 92 CR. 1189, 1993 WL 183694, at *4 (S.D.N.Y. May 25, 1993)).[40]

This case is no exception to the long line of authorities cited. It cannot be said that there was no "legitimate basis" for this grand jury investigation, which was investigating the World Trade Center attacks. *Regan,* 103 F.3d at 1079 (quotation marks, citation omitted). Nor was the questioning unrelated to the purpose of the investigation. *See Wheel,* 34 F.3d at 67. The questioning of Awadallah focused on his acquaintance with two of the known hijackers and their activities during the time he knew them, which was approximately nine months prior to the hijacking. Answers to these questions could *conceivably* have advanced the investigation by providing leads as to other contacts or acquaintances of those hijackers, who might, in turn, have had pertinent information.

While not legally sufficient to dismiss the indictment, the government's motivation in calling Awadallah before the grand jury remains troubling. Awadallah had consistently told the authorities that he knew Al–Hazmi and he provided details of their encounters. He had also told the police that he had met another man in Al–Hazmi's company on more than one occasion and provided a physical description of that other man. Moreover, because hearsay is admissible in a grand jury, the government could have had the FBI agents who interviewed Awadallah provide much of the same information to the grand jury. *See Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Most importantly, Awadallah had consistently denied knowing that man's name—he said so on September 20 during his interview with the FBI, again on September 21 during his polygraph examination and subsequent interviews, and once again at the proffer session on October 4, 2001.[41] Under these circumstances, it is unclear how Awadallah's testimony on this point could possibly have furthered the grand jury's investigation. *See Brown v. United States,* 245 F.2d 549, 555 (8th Cir.1957)("Extracting the testimony from defendant had no tendency to support any possible action of the grand jury within its competency. The purpose to get him indicted for perjury and nothing else is manifest beyond all reasonable doubt.").

**40.** The same is true in other Circuits. *See, e.g., Chen,* 933 F.2d at 797 ("We need not decide in this case whether to embrace the perjury trap doctrine. Here, the facts render the perjury trap defense inapplicable in any event.").

**41.** Because the government thought, all along, that Awadallah knew the man's name, it could have indicted him for lying to a federal official prior to his grand jury testimony. *See* 18 U.S.C. § 1001 (prohibiting giving materially false statements to federal officials). *See also United States v. Schwarz,* 283 F.3d 76, 110 (2d Cir.2002).

The government knew that calling Awadallah before the grand jury placed him in an impossible position. If he testified in a manner consistent with his four prior statements to federal officials, as was to be expected, he would be indicted for perjury. If, on the other hand, he now admitted knowing Al–Mihdhar's *name* (as opposed to knowing *him*, which he repeatedly admitted), he could be indicted for having previously lied to federal officials. Either way, this no-win, no-exit game would have little, if any, impact on the pending investigation.

Regardless of the futility of the government's questions or the dubiousness of its motives, courts have repeatedly held that such a situation does not constitute a "perjury trap." *See Chen*, 933 F.2d at 798 ("[W]hile the government may have anticipated Chen would give false testimony before the grand jury, it is also apparent the government 'recognized that [Chen] … might provide information about the pending investigation.' Indeed, the government had reason to expect that Chen would testify truthfully once placed in the solemn atmosphere of the grand jury room.") (citation omitted); *United States v. Chevoor*, 526 F.2d 178, 185 (1st Cir.1975) (holding that although government expected Chevoor to perjure himself, it was not impermissible to call him to testify), *abrogated on other grounds, Brogan v. United States*, 522 U.S. 398, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998); *United States v. Bin Laden*, No. S(7) 98 Cr. 1023, 2001 WL 30061, at *8, n. 15 (S.D.N.Y. Jan.2, 2001)("In his attempt to persuade the Court that these grand jury appearances were a perjury trap, the Defendant argues that the Government '*knew the answers to its questions*.' We find this argument highly unpersuasive.") (emphasis in original, citation omitted); *United States v. Icardi*, 140 F.Supp. 383, 388 (D.D.C.1956). *But see United States v. Remington*, 208 F.2d 567, 573 (2d Cir.1953) (Hand, J., dissenting) ("Save for torture, it would be hard to find a more effective tool of tyranny than the power of unlimited and unchecked ex parte examination.").

Recognizing the overwhelming weight of these authorities, I cannot find that the government's conduct rose to the level of a legally cognizable "perjury trap." Common sense, of course, might dictate otherwise.

## VI. CONCLUSION

To summarize:

1. Because the arrest warrant was improvidently issued due to intentional misrepresentations and omissions, the grand jury testimony must be suppressed resulting in dismissal of the indictment.

2. All evidence and statements obtained from Awadallah during the encounters on September 20–21, 2001, must be suppressed because Awadallah was unlawfully seized and his consents were not voluntary.

3. The government did not set a perjury trap for Awadallah.

SO ORDERED.